IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JERRY OUTLAW<br><br>**PLAINTIFF,**<br><br>v.<br><br>CITY OF CAHOKIA, CHIEF JAMES JONES, DET. MATTHEW MASON, COUNTY OF ST. CLAIR, RICK WATSON, PHILLIP MCLAURIN, and JOHN DOES 1-3,<br><br>**DEFENDANT.** | Case no.<br>15-cr-30081-DRH<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Jerry Outlaw, by one of his undersigned attorneys, LaToya M. Berry, complains against Defendants The City Of Cahokia, Chief James Jones, Det. Matthew Mason, County Of St. Clair, Don Schaefer, Superintendent Phillip McLaurin, Sheriff Rick Watson, and As-Yet Unknown County of St. Clair Employees, John Does 1-3, alleges as follows:

### Introduction

1. Jerry Outlaw files this complaint to seek redress for injuries and damages suffered as a result of his unlawful arrest, interrogation, incarceration, and prosecution for an armed robbery he did not commit.

2. In March 2015, Jerry Outlaw, was a 19-year old new father that loved spending time with his small family and living a quiet lifestyle. With an I.Q. of 63, Jerry also faced the challenge of living with an intellectual disability.

3. With knowledge of Jerry's handicap, police officers at Cahokia Police Department took advantage of his mental deficiencies and coerced a false confession for a crime that Jerry had no knowledge of.

4.　　　　After being charged for Armed Robbery, Jerry was placed in the St. Clair County Jail for nearly eight months awaiting trial. While there, Jerry was forced to fight for his life against older, larger inmates. While defending himself, Jerry was placed in solitary confinement for thirty days, 24-hours a day, exacerbating his mental disorder and causing him extreme mental anguish and suffering.

### Nature of Action, Jurisdiction, and Venue

5.　　　　This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Jerry Outlaw's rights as secured by the United States Constitution.

6.　　　　This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

7.　　　　Venue is proper under 28 U.S.C. § 1391(b). Jerry resides in this judicial district and the events giving rise to the claims asserted herein occurred within this judicial district.

### The Parties

8.　　　　Plaintiff Jerry Outlaw is a citizen of the State of Illinois who resides within this judicial District. He is currently twenty years old.

9.　　　　At all relevant times, Defendants James Jones, and Matthew Mason, were officers with the Cahokia Police Department and acting within the scope of their employment.

10.　　　　The City of Cahokia is and at all times mentioned herein, a municipality organized and operating under the statutes of the State of Illinois.

11.　　　　Defendant Richard "Rick" Watson is the Sheriff of St. Clair County. At all times relevant to the events at issue in this case, Defendant Watson was employed by the St. Clair County Sheriff's Department in the capacity of Sheriff. As such, he was acting under color of law. At all times relevant to the events at issue in this case, Defendant Watson promulgated rules, regulations, polices, and procedures as Sheriff of St. Clair County for the provision of

certain mental health care by medical personnel and correctional officers to detainees at the St. Clair County Jail. He is sued here in his official capacity.

12. Defendant Major Phillip McLaurin is the Superintendent of the St. Clair County Jail. At all times relevant to the events at issue in this case, Defendant McLaurin was employed by the St. Clair County Sheriff's Department. As such, he was acting under color of law. At all times relevant to the events at issue in this case, Defendant McLaurin was responsible for implementing the policies and procedures promulgated by Defendant Watson, supervising all staff and managing all aspects of Jail operations. He is sued in his individual capacity.

13. Defendant St. Clair County is a county of the State of Illinois. It oversees the St. Clair County Sheriff's Department which, in turn, operates the St. Clair County Jail,

14. Defendants Officers John Doe 1-3 were employees of the St. Clair County Jail during the relevant period. At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with St. Clair County Jail. These defendants are sued here in their individual capacities.

**The Armed Robbery**

15. On or about March 12, 2015 at 10:23pm, forty-three year old Keith Holman reported that he had been attacked as he was entering his front door.  Two men approached him with guns and requested "the money".  While making these demands, one of the men hit Keith over the head with a gun in the front yard.  Through the commotion, Keith's wife, Marquis Foster exited the home, and asked what was going on.  The second man grabbed her and told her to get down on ground.  Eventually they were brought inside, and Keith was hit in the head again by the first gunman and ordered to hand over his money.  Afterwards, Keith went to a back room, located some money, and handed the money covered in blood to the two men.  The men also took Keith's cell phone and then left on foot.  The entire time, Keith's 16-year old

stepdaughter referred to herein as D.F., was in her bedroom, watching what happened on the porch from her bedroom window; and stayed in her room.

16. On scene, Keith, his wife and stepdaughter described the suspects as wearing all black, not wearing masks and being unknown to them. Keith told officers they were the same men that robbed him in November in the same fashion.

## The Interviews

17. Keith Holman's 16-year old, step daughter, D.F., was interviewed on scene after the alleged armed robbery. In his report, Ptlm. Kyle Waddington, remarked how suspicious D.F. was acting. As he noted, she was "hesitant to be forthcoming with information". Further after questioning D.F., she indicated the officer told her he suspected she was involved. When asked if she knew who the suspects were, she replied, "No, I have no idea".

18. The next day, March 13, 2015, Keith Holman gave a videotaped interview with Defendant Matthew Mason of Cahokia Police Department. During that interview, Keith revealed that he suspected his stepdaughter, D.F., set him up. In describing this, he noted his belief that she knew the gunmen, and that she told them he has a lot of money.

19. A third witness, hereinafter referred to as D.A., also came forward. This witness was able to describe the armed robbery in details not released to the public. The witness also gave the names of two people that committed the offense as Jarrett Richardson and "Kelvo". D.A. explained that the suspects described their plan to commit the robbery before it ever happened; and the morning after they committed the robbery, showed him the bloody money. D.A. also described D.F. as having purposely given false names of Jerry Outlaw and Delarren Mason in retaliation for Delarren rejecting a relationship with her despite her pursuits.

## False Identifications and Cahokia Police Department's
## Investigation of Jerry Outlaw

20. During Keith Holman's second interview at the police station on March 13, 2015, off camera, he tells the officers that his step-daughter D.F. gave him the name of the two men that committed the offense. He then gave the nicknames of "T-Man" and "Little D". These are also the nicknames of Jerry Outlaw and his brother, 17-year old Delarren Mason, respectively. Keith acknowledged that he knew them from living in the neighborhood and cutting his grass. Afterwards, he directed the officers in their patrol car to Jerry and Delarren's house on Andrews Avenue.

21. On the same day, the police also had D.F. and her mother, Marquis Foster to view a photo lineup on video. D.F. informed the officers that she knew Delarren and Jerry well from school and the neighborhood. D.F. identified Delarren as the first gunman who hit Keith over the head.

22. Even though normal line up procedures are used for stranger attacks and crimes; somehow the police determined to do a photo lineup of Jerry and Delarren on witnesses that knew them or had knowledge of them by name, face and interaction. At no point during this interview does the Defendant, Matthew Mason, ask D.F. why immediately after the robbery she said she did not know the two men who committed the crime and could not identify them. Further, Det. Mason does not address why D.F.'s father was suspicious of her or why officer Waddington treated her as a possible suspect the previous day. Instead, he allowed her false identification and allowed her to taint the other witnesses which resulted in D.F. and her mothers false identification. As noted, Keith did not pick Jerry out of a line up. As such, the photo lineup was of no effect. Also, the officers Gathered no independent evidence, only the word of D.F.—a potential suspect and the word she gave to her parents.

**Arrest of Jerry Outlaw**

23. On March 17, 2015, acting on the word of D.F., approximately ten officers from the Cahokia Police Department, the U.S. Marshalls, and probation department surrounded Jerry's house and knocked on the door. His mother, Lashunda Green, answered the door. Instantly alarmed, she asked why the officers were there. They told her they were there to serve a traffic warrant on Jerry. All of the officers immediately pushed past her and began ransacking the house—turning over beds, mattresses and emptying drawers and more. When she made inquiry about why they were destroying her house over a traffic warrant, Ms. Green was then arrested and taken into custody.

24. The officers discovered Jerry asleep in a back room and arrested him—placing handcuffs tightly on him behind his back. Still only informing Jerry that he was under arrest for a traffic warrant, he was taken through the hallway where officers ran his head through a wall. Jerry was then taken to the Cahokia Police Station for a custodial interview.

25. Jerry was isolated from his mother. Instead of allowing Ms. Green to go with Jerry, the officers whisked her away on a scavenger hunt in search of Delarren; promising to release her from custody only if she located Delarren for them.

**Interrogation of Jerry Outlaw**

26. At the time of his interrogation, Jerry Outlaw was nineteen years old. However, he had an I.Q. of 63 and the intellectual functioning of a nine year old. Even more, his latest Individual Educational Plan (IEP) assessed him at the reading and comprehension level of a third grader. His cognitive disability left him more vulnerable to suggestibility than the average person. This also marked Jerry's first time being interrogated by police or arrested on a felony offense.

27. Because of Jerry's mental makeup, his age, lack of experience, and lack of parental support, he was exceptionally susceptible to the coercive interrogation techniques employed by the officers.

28. Jerry's mental handicap, however, was made known to the officers early on. When Defendant's James Jones and Matthew Mason, who conducted the interview, asked Jerry to read a sign out loud, Jerry began sounding out words on the sign. This immediately put the detectives on notice of Jerry's low cognitive level.

29. Jerry, having continued difficulty understanding the officers, also informed them that he was slow in understanding stating, "<u>I am slow in the head</u>" and "can you bring me to memory?"

30. In response, Detective Jones and Mason started their substantive interrogation by stacking Jerry's family against him. First Defendant Jones informed Jerry that his brother, Delarren, had already confessed to the crime, told the truth, and implicated Jerry. In fact, his brother had not been questioned or even arrested yet. The officer continued on this track by informing Jerry his mother made a statement against him concerning his handling of the gun. In a final blow, the officers told Jerry his girlfriend made a statement denying Jerry was with her on the night and time of the incident in East St. Louis. None of these things were true or ever happened; neither did the officers question Jerry's girlfriend or his mother. Yet the officers took advantage of Jerry's lowered intellectual functioning and vulnerability to coerce this false confession.

31. Next, the officers continued to play on Jerry's emotions. They informed him that his "little brother" was more of a man than him. They went further, indicating his brother prayed, cried, came to Jesus and his mother and then told the truth. Officer Jones then compared him to a murderer and asked if he was "coldblooded". They threatened Jerry that his mother

would lose her house and end up in the street with all of his young siblings. In another devastating threat, the officers implied that he would not see his infant son grow up if he did not confess. On the other hand, however, the officers informed Jerry that if he did confess it was just a "simple theft" and he would receive leniency; and further, he would be able to go home sooner and save the lives of his family.

32. Once Jerry was sufficiently broken down; the officers force fed Jerry lines. First, they informed Jerry of key elements of the crime as follows:

   a. Time, Date and Location: "it happened last Thursday on Park Lane…between 10-11:00pm".

   b. Parties involved: informed Jerry the victims were a man and a woman; Jerry responded by asking if it was Delarren and his girlfriend because they "got into it" last week.

   c. Actions taken: stating, you did not hit the person with the gun we know he (Delarren) did.

33. After sufficiently feeding him lines, the officer asked Jerry to recite what happened. Jerry then asked, "So I hit somebody with a gun?"

34. The officer responded angrily by correcting Jerry and stating that "'D' hit the guy with the gun". Jerry then asks, "At whose house, at my house?"

35. Jerry continued to get details of the armed robbery wrong and was constantly berated by the officers as a result; but also constantly had details fed to him.

36. Throughout the interrogation, Jerry repeatedly denied any involvement—or even any knowledge of what the officer was talking about. Whenever Jerry asserted his innocence, the officers continued to call Jerry a liar and redirect him. At no point did Jerry ever waive his Miranda rights, neither did he have the ability to do so.

37.     When asked what he had on, Jerry continued to deny involvement stating he was not there but would describe what he wore on Thursday: "I had on true religion pants and white t-shirt and new shoes and necklace…" Once Defendant Jones expressed dissatisfaction with Jerry's description, Jerry responded, "What am I supposed to have on, all black? That's what everyone wears when they do something". He then agreed he had on the color black.

38.     Following this, Defendant Jones asks Jerry about a pertinent detail in the armed robbery concerning his actions with the woman, stating "… what did you do; did you make her get on ground or did you make her jump up?" Jerry responded by telling the officer, "<u>I told her to get out the car; that's what I'm saying, I told her to get out the car</u>". It should be noted, the entire incident took place at the victims house. No car was ever involved at any point in the robbery.

39.     In summarizing, Jerry never could get the hang of completely saying he did the robbery. Defendant Jones asked Jerry whether this was "the first time doing something like this". Jerry responded, "I never did it, but yeah"

40.     Finally, Defendant Jones asks Jerry whether he wanted to say anything to the victims. Jerry responded by saying, "tell them I'm really sorry, I'll never do it again—which I didn't". He denied involvement through the very end

### Detention, Prosecution, and Dismissal of Charges

41.      On the sole basis of his coerced and fabricated confession, Jerry Outlaw was detained in the St. Clair County Jail and charged with armed robbery while armed with a firearm in the Circuit Court of St. Clair County. The charge carried with it a sentencing range of six to thirty years in prison, if convicted, plus an additional mandatory fifteen years under Illinois' firearm enhancement statute. But for the Defendants' actions, Jerry would not have been arrested, detained, charged, or prosecuted.

42. Jerry sat in the St. Clair County Jail for nearly eight months while the charges remained pending. His bond was set at $250,000. While there, Jerry was attacked by an older, larger inmate. He was forced to defend himself for his own safety. Instead of protecting Jerry, three officers at St. Clair County Jail responded by placing Jerry in a maximum security cell—otherwise known as solitary confinement. Jerry remained in a tiny solitary confinement cell for 30-days at 24-hours a day without any human interaction. This caused him extreme mental anguish.

43. In a final order from the court on October 30, 2015, the case against Jerry and Delarren was ordered to be dismissed. The court order read that (1) the court received a finding from Dr. Cuneo that Jerry was incapable of waiving his Miranda rights, (2) that credible witnesses had come forward implicating two other suspects; and (3) that Delarren had passed a lie detector test. Jerry and Delarren were ordered to be released instanter.

## Jerry Outlaw Damages

44. Jerry Outlaw endured a psychologically coercive, traumatic, and terrifying police interrogation during which he was forced to confess to an armed robbery that he did not commit.

45. Jerry spent seven and a half months in jail facing felony charges for that crime. During his incarceration, Jerry was subjected to repeated trauma and abuse. He missed time spent with his family and friends, as well as educational and career opportunities. Further, he was deprived of the fundamental freedom to live his life as a free human being.

46. Jerry was humiliated and his reputation was damaged by the publicity surrounding his case, which would not have been generated but for the Cahokia Police Department and St. Clair County's actions.

47. As a result of the foregoing, Jerry Outlaw has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all directly and proximately caused by Defendants' actions.

### Count I – 42 U.S.C. § 1983
### Coercive Interrogation

48. Each paragraph of this Complaint is incorporated as if restated fully herein in paragraphs 1-43.

49. In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy, interrogated Jerry Outlaw using coercive measures and forced Jerry Outlaw to falsely incriminate himself in the armed robbery of Keith Holman and Marquis Wilson against his will, in violation of his Fifth and Fourteenth Amendments rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law

50. By using coercive and abusive techniques to interrogate Jerry Outlaw, the Defendant Officers directly and proximately caused Jerry Outlaw's injuries and damages, as more fully set forth above. The false statements coerced by the Defendant Officers and attributed to Jerry Outlaw were used to initiate and prosecute a criminal case against him. The statements coerced by the Defendants served as the sole basis for the arrest and detention of Jerry Outlaw for more than nine months in the St. Clair County Jail for a crime he did not commit.

51. The Defendant Officers acted maliciously, willfully, wantonly, and/or with reckless disregard for Jerry Outlaw' clearly established constitutional rights. Their misconduct was done in total disregard of the truth and Jerry Outlaw's innocence.

## Count II – 42 U.S.C. § 1983
### False Arrest

52. Each paragraph of this Complaint is incorporated as if restated fully herein in paragraphs 1-43.

53. The Defendant Officers caused Jerry Outlaw to be arrested and detained without probable cause or reasonable suspicion in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

54. Following his unlawful arrest, the Defendants caused Jerry Outlaw to be subjected to a coercive interrogation that ultimately resulted in Jerry Outlaw confessing falsely to the armed robbery of Keith Holman and Marquis Foster and being charged with the crime.

55. Jerry Outlaw's false confession and wrongful confinement in the St. Clair County Jail were the direct and proximate result of the Defendants' violation of Jerry Outlaw's Fourth and Fourteenth Amendment rights.

56. The Defendant Officers acted maliciously, willfully, wantonly, and/or with reckless disregard for Jerry Outlaw' clearly established constitutional rights.

57. As a direct and proximate result of the Defendants' misconduct, Plaintiff suffered injuries, as more fully alleged above.

## Count III – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

58. Each paragraph of this Complaint is incorporated as if restated fully herein in paragraphs 1-43.

59. After being assigned to investigate the armed robbery of Keith Holman and Marquis Foster, the Defendant Officers and other as-yet-unknown co-conspirators reached an agreement among themselves to frame Jerry Outlaw for the crime and to thereby deprive Jerry Outlaw of his constitutional rights, including his right to be free from self-incrimination and false arrest, as described in the paragraphs above.

60. In this manner, the Defendant Officers, acting in concert with other as-yet unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

61. In furtherance of the conspiracy, each of the co-conspirators committed overt acts, as described above in the Complaint, and was an otherwise willful participant in joint activity.

62. Each of the individual named defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Jerry Outlaw' clearly established constitutional rights.

63. As a direct and proximate result of the Defendants' misconduct, Plaintiff suffered injuries, as more fully alleged above.

### Count IV – State Law Claim
### Malicious Prosecution

64. Each paragraph of this Complaint is incorporated as if restated fully herein in paragraphs 1-43.

65. The Defendant Officers, despite knowing that probable cause did not exist to arrest and prosecute Jerry Outlaw for the armed robbery of Keith Holman and Marquis Foster, acted individually, jointly, and/or in concert and in conspiracy, to cause Jerry Outlaw to be arrested and prosecuted for that crime.

66. Specifically, the Defendant Officers were aware that no true or reliable evidence implicated Jerry Outlaw in the armed robbery, all inculpatory evidence was coerced and fabricated, the Defendants' suspected D.F. and yet solely relied on her for identification of Jerry; and her directing identification to Holaman and Foster. Furthermore, the Defendant Officers ignored and failed to investigate easily accessible evidence that would have led to the actual perpetrators. The Defendant Officers performed the above-described acts deliberately, with malice, and with reckless disregard for Jerry Outlaw's rights.

62. On October 30, 2016, Jerry Outlaw's charges were dismissed on motion of the St. Clair County State's Attorney's Office, which constituted a termination of the criminal proceedings in his favor.

63. As a direct and proximate result of the Defendants' misconduct, Plaintiff suffered injuries, as more fully alleged above.

### Count V – State Law Claim
### Intentional Infliction of Emotional Distress

64. Each paragraph of this Complaint is incorporated as if restated fully herein in paragraphs 1-43.

65. The acts and conduct of the Defendant Officers, as set forth above, were extreme and outrageous. The Defendants' actions were rooted in an abuse of power and authority, and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Jerry Outlaw, as is more fully alleged above.

66. As a direct and proximate result of the Defendants' actions, Jerry Outlaw suffered and continues to suffer severe emotional distress damages.

### Count VI – State Law Claim

### Civil Conspiracy

67. Each paragraph of this Complaint is incorporated as if restated fully herein in paragraphs 1-42.

68. As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other as-yet unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

69. In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Jerry Outlaw and the intentional infliction of emotional distress upon him.

70. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to Jerry Outlaw's rights.

71. As a direct and proximate result of the Defendants' conspiracy, Jerry Outlaw suffered injuries, including severe emotional distress and anguish, as is more fully alleged above.

### Count VII – State Law Claim
### Respondeat Superior

72. Each paragraph of this Complaint is incorporated as if restated fully herein in paragraphs 1-42.

73. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the St. Clair County Sheriff's Department, acting at all relevant times within the scope of their employment.

74. Defendant St. Clair County is liable as principal for all torts in violation of state law committed by its agents.

### Count VIII – State Law Claim
### Indemnification

75. Each paragraph of this Complaint is incorporated as if restated fully herein in paragraphs 1-42.

76. Illinois law, pursuant to 745 ILCS 10/9-102, provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

77. The Defendant Officers are or were employees of the St. Clair County Sheriff's Department who acted within the scope of their employment in committing the misconduct described herein. St. Clair County is liable for any judgment entered against the individual Defendants in this action.

### Count IX – 42 USC 1983 Cruel and Unusual Punishment

78. Each paragraph of this Complaint is incorporated as if restated fully herein in paragraphs 1-43.

79. Defendant, acting under color of state law, deprived Plaintiff of rights, privileges, and immunities secured by federal law and the Constitution of the United States, including Plaintiff's rights to be free from cruel and unusual punishment, secured by the Eighth Amendment, by committing the actions and non-actions stated above.

80. Defendants' aforementioned actions and non-actions exhibited a deliberate indifference for Plaintiff's rights.

81. That as a direct and proximate result of one or more of the foregoing acts or omissions on the part of the defendant, Plaintiff was damaged in that he was forced to suffer risk to health, humiliation, embarrassment, ridicule, and emotional distress.

82. That the aforementioned acts by the Defendants constituted cruel and unusual punishment in violation of the Plaintiff's eighth amendment rights.

**Prayer for Relief**

WHEREFORE, Plaintiff, JERRY OUTLAW, respectfully requests that this Court enter judgment in his favor and against Defendants, City Of Cahokia, Chief James Jones, Det. Matthew Mason, County Of St. Clair, Don Schaefer, Superintendent Phillip McLaurin, Sheriff Rick Watson, and As-Yet Unknown County of St. Clair Employees, John Does 1-3, awarding compensatory damages against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief that this Court deems appropriate.

Plaintiff JERRY OUTLAW hereby demands a trial by jury.

                                                  Respectfully submitted,

                                                  /s/ LaToya Berry
                                                LaToya Berry
                                                IL Bar # 6289060
                                                An Attorney for Plaintiff
                                                901 West Main Street
                                                Belleville, IL 62220
                                                (618) 567-4837 ph
                                             (866) 333-7175 fax

## CERTIFICATE OF SERVICE

      I hereby certify that on April 25, 2015, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all other parties of record in this case.

                        /s/ LaToya Berry  
                        IL Bar # 6289060  
                        An Attorney for Plaintiff  
                        901 West Main Street  
                        Belleville, IL 62220  
                        Tel. (618) 567-4837  
                        Fax (866) 333-7175  
                        Missberry_esq@yahoo.com