UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JERRY OUTLAW,<br><br>   Plaintiff,<br><br>v.<br><br>CITY OF CAHOKIA, CHIEF JAMES JONES, DET. MATTHEW MASON, COUNTY OF ST. CLAIR, SHERIFF RICHARD WATSON, SUPT. PHILLIP MCLAURIN, LT. NANCY SUTHERLIN, SGT. STEVEN STRUBBERG, OFFICER CHRISTOPHER HOERNIS, LT. JOHN FULTON, SGT. MATTHEW R. SCOTT, SGT. BRIAN CUNNINGHAM and LT. KARL L. PANNIER,<br><br>   Defendants. | Case No. 16-cv-456-JPG-SCW |

## **MEMORANDUM AND ORDER**

This matter comes before the Court on the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by defendants Village of Cahokia, James Jones and Matthew Mason (the "Cahokia defendants") (Doc. 91). They seek dismissal of Counts I, II, V, VI, VII, VIII and IX.[1] Plaintiff Jerry Outlaw has responded to the motion (Doc. 103), and the Cahokia defendants have replied to that response (Doc. 104).

**I. Standard for Dismissal**

When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts as true all allegations in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To avoid dismissal under Rule 12(b)(6) for failure to state a claim, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This requirement is satisfied if the complaint (1)

---

[1] Count IX is mislabeled in the Second Amended Complaint as a second Count IV. Clearly this is a typographical error as the count follows Count VIII, so the Court refers to the count as Count IX.

describes the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests and (2) plausibly suggests that the plaintiff has a right to relief above a speculative level. *Bell Atl.*, 550 U.S. at 555; *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl.*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679.

In *Bell Atlantic*, the Supreme Court rejected the more expansive interpretation of Rule 8(a)(2) that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). *Bell Atlantic*, 550 U.S. at 561-63; *Concentra Health Servs.*, 496 F.3d at 777. Now "it is not enough for a complaint to avoid foreclosing possible bases for relief; it must actually suggest that the plaintiff has a right to relief . . . by providing allegations that 'raise a right to relief above the speculative level.'" *Concentra Health Servs.*, 496 F.3d at 777 (quoting *Bell Atl.*, 550 U.S. at 555).

Nevertheless, *Bell Atlantic* did not do away with the liberal federal notice pleading standard. *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007). A complaint still need not contain detailed factual allegations, *Bell Atl.*, 550 U.S. at 555, and it remains true that "[a]ny district judge (for that matter, any defendant) tempted to write 'this complaint is deficient because it does not contain . . .' should stop and think: What rule of law *requires* a complaint to contain that allegation?" *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005)

2

(emphasis in original). Nevertheless, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl.*, 550 U.S. at 555. If the factual detail of a complaint is "so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8," it is subject to dismissal. *Airborne Beepers*, 499 F.3d at 667.

## II. Facts Alleged

### A. Sources Considered

As a preliminary matter, when considering the facts alleged in the Second Amended Complaint, the Court declines to consider the video submitted by the Cahokia defendants in support of their motion. The video purports to be a recording of a custodial interview of Outlaw by Jones and Mason, one of the central events in Outlaw's claims against Jones and Mason.

With certain exceptions, when matters outside the plaintiff's pleading are presented in connection with a Rule 12(b)(6) motion to dismiss, the Court may treat the motion to dismiss as a motion for summary judgment or it may exclude the additional material from consideration. *See* Fed. R. Civ. P. 12(d). There is an exception to this rule for matter which is an exhibit to the complaint, *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002); *see Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013); Fed. R. Civ. P. 10(c) (stating that a written instrument attached to a pleading is a part of the pleading), or a document which is central to the complaint but not attached to it, *Minch v. City of Chicago,* 486 F.3d 294, 300 n. 3 (7th Cir. 2007). Both of these categories of materials may be considered in a Rule 12(b)(6) motion without converting it to a summary judgment motion.

The tendered video falls into neither category; it is neither an exhibit to the complaint nor a document central to the complaint but not attached. Because it falls into neither of these

exceptions to the general rule, nor any other exception, the Court will not consider it in connection with a motion under Rule 12(b)(6). The Court further declines to convert the motion to a motion for summary judgment and will consider the motion as it was captioned, under Rule 12(b)(6).

B. Facts Alleged

Accepting as true all factual allegations in the Second Amended Complaint and drawing all reasonable inferences therefrom in Outlaw's favor, the pleading establishes the following relevant facts for the purposes of this motion:

In March 2015, Outlaw was a 19-year-old man with an IQ of 55[2] and the intellectual functioning of a nine-year-old. Witnesses directly or indirectly identified him as the perpetrator of a robbery along with his brother, although Outlaw did not actually commit the robbery. A few days later, on March 17, 2015, law enforcement officers went to Outlaw's home, arrested him and took him to the Cahokia Police Station for questioning. They did not allow his mother to accompany him.

At the station, Jones and Mason conducted the custodial interrogation. It was clear from the beginning of the interview that Outlaw had mental handicaps. When Jones and Mason asked Outlaw to read a sign out loud, Outlaw began sounding out the words, but could not read the word "monitored." Outlaw told the officers, "I am slow in the head," "I lose memory real fast," and "Can you bring me to memory?" Jones and Mason took advantage of his intellectual deficiencies to intimidate, coerce or trick Outlaw into signing a waiver of his *Miranda* rights and falsely confessing to the robbery.

---

[2] A full scale IQ score of two standard deviations below the population mean – a score of approximately 70 on the Wechsler Adult Intelligence Scale, the most commonly given intelligence test – is generally accepted as the threshold score indicating significant subaverage intellectual functioning. *See* American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification and Systems of Support* 35 (11th ed. 2010). If Outlaw's score was 55, that would be approximately three standard deviations below the mean and would indicate his intellectual functioning level might rank in the bottom 0.1% of the population.

For example, at the beginning of the interview, Jones quickly read Outlaw his *Miranda* rights and obtained Outlaw's signature on a sheet indicating that he understood his rights, although he never asked Outlaw if he waived those rights and Outlaw never stated orally that he waived those rights. In fact, Outlaw did not have the mental ability to understand his *Miranda* rights.

Despite knowing of Outlaw's low cognitive level, Jones and Mason employed interview tactics designed for fully-functioning, capable adults such as, for example, falsely telling him others had given statements against him, playing on his emotions, threatening actions if he did not cooperate, minimized the severity of the crime to encourage a confession, and giving him details of the crime for him to recite as if they were true. Specifically:

- Jones told Outlaw (1) that his brother had already confessed to the robbery, had told the truth, and had implicated Outlaw, (2) that his girlfriend had denied Outlaw was with her at the time of the robbery, and (3) that his mother had made a statement against him concerning his handling of the gun. In fact, law enforcement had not interviewed Outlaw's brother, girlfriend or mother yet.

- Jones told Outlaw, "I don't think you are the monster [your brother] says you are," that his "little brother" was more of a man than he was, and that his brother had cried, found Jesus and his mom in his heart, and then told the truth about the robbery. Jones and Mason told Outlaw his brother had a bigger heart than he did and that Outlaw was acting "coldblooded."

- Jones and Mason threatened to have federal authorities charge Outlaw with a crime for having his mother's gun in his room. They implied that Outlaw would not see his infant son grow up. They also threatened Outlaw by saying his mother would lose her Section 8 housing and end up in the street with all of his younger siblings if he did not admit to committing the armed robbery.

- Jones and Mason told Outlaw that it was just a "stupid," "simple" theft, and implied that if he confessed, he would receive leniency. They told Outlaw that "this is a speed bump," and that he is "making this a mountain" by not cooperating. They also told Outlaw that they knew he only wanted the money to provide for his baby because "that's what men do, they provide."

After telling Outlaw the details of the crime, Jones and Mason asked Outlaw to recite the details. When he asked questions or became confused about what happened, when he recited a

5

detail differently than Jones and Mason wanted, or when he professed his innocence, Jones and Mason became frustrated and angry, berated Outlaw for getting details wrong, and fed him more details. Outlaw eventually agreed to the version of events Jones and Mason had provided to him, although often in the same breath he denied involvement with or knowledge of the robbery. For example, Outlaw stated during the interview, "I don't do robberies. I'm just going along with what ya'll are telling me." When Jones asked Outlaw if this was his first time doing something like this, Outlaw responded, "I never did it, but yeah." When Jones asked Outlaw if he wanted to say anything to the victims, Outlaw responded, "Tell them I'm really sorry, I'll never do it again—which I didn't—but I'll never do it again."

Following his interrogation, Outlaw was detained at the St. Clair County Jail and indicted for armed robbery by a state court grand jury that had been presented with Outlaw's custodial statements. On October 30, 2015, the state court dismissed the criminal case against Outlaw, and Outlaw was immediately released from jail. One of the factors supporting the state court's dismissal of the charges was a medical report finding Outlaw did not have the mental capacity to waive his *Miranda* rights.

The Second Amended Complaint contains nine causes of action. Those relevant to this motion are as follows:

**Count I:** A claim against Jones and Mason for a Fourteenth Amendment substantive due process violation because of a coercive and abusive police interrogation that shocks the conscience and that resulted in a false confession;

**Count II:** A claim against Jones and Mason for a Fifth Amendment Self-Incrimination Clause violation because of a coercive police interrogation that that resulted in a false confession that was used to initiate a criminal prosecution;

**Count V:** A claim against Jones and Mason for conspiring to deprive him of his constitutional rights by coercing him to falsely confess.

6

**Count VI:** A claim against Jones and Mason for the state law tort of intentional infliction of emotional distress.

**Count VII:** A claim against Jones and Mason for the state law tort of civil conspiracy.

**Count VIII**: A claim against the Village of Cahokia under a *respondeat superior* theory for the state law violations of Jones and Mason.

**Count IX:** A claim against the Village of Cahokia for payment of the judgments of Jones and Mason.

The Cahokia defendants now ask the Court to dismiss the foregoing counts on the grounds that the allegations fail to plausibly suggest a right to relief on Outlaw's claims and/or that Jones and Mason are entitled to qualified immunity. Outlaw contends his Second Amended Complaint is satisfactory and that the defendants are not entitled to qualified immunity.

## III. Analysis

### A. Count I: Substantive Due Process

#### 1. Failure to State Claim

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. 14. This clause encompasses three types of protection. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). The first type consists of a claim based on a violation of a specific provision listed in the Bill of Rights. *Id.* The second type of protection, referred to as substantive due process, bars certain arbitrary, wrongful government action. *Id.* The third type of protection guarantees fair procedures. *Id.*

Count I is a claim under 42 U.S.C. § 1983 for violation of Outlaw's Fourteenth Amendment substantive due process rights because the manner of his custodial interrogation shocks the conscience. Substantive due process claims aim to protect the individual against arbitrary government action by "the exercise of power without any reasonable justification in the

service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The substantive due process guarantee was intended not simply to protect from harm by government officials but to protect from government officials' abusing power or using it as an instrument of oppression. *See Lewis*, 523 U.S. at 848-49. Therefore, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Lewis*, 523 U.S. at 846 (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 129 (1992)). The level of abuse cognizable in a substantive due process claim is government conduct that "shocks the conscience." *Lewis*, 523 U.S. at 846; *see Rochin v. California*, 342 U.S. 165, 172-73 (1952) (forcing an emetic down a suspect's throat to extract evidence from the suspect's stomach shocks the conscience). Whether conduct shocks the conscience is to be determined by examining the totality of the circumstances. *Lewis*, 523 U.S. at 850. The Supreme Court has described the real question as whether the conduct is "too close to the rack and the screw." *Rochin*, 342 U.S. at 172. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849.

In the specific context of police interrogation, "[c]onvictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience violate the Due Process Clause." *Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (Thomas, J.) (brackets in original) (quoting *Rochin*, 342 U.S. at 172, 174). However, mere persistent questioning is not, by itself egregious or conscience-shocking so as to trigger substantive due process concerns. *Chavez*, 538 U.S. at 774-75 (Thomas, J.) (finding persistent questioning of suspect who thought he was dying in hospital setting in effort to investigate potential police misconduct was not egregious where medical treatment was able to be administered and where

8

questioning did not exacerbate injuries or prolong hospital stay). Nor is the use of ordinary interrogation tactics such as lying to, threatening in a non-violent way, insulting or making false promises to a suspect. *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010) (citing *Tinker v. Beasley*, 429 F.3d 1324, 1329 (11th Cir. 2005).

The recent Seventh Circuit Court of Appeals decision in *Cairel v. Alderden*, 821 F.3d 823 (7th Cir.), *cert. denied*, 137 S. Ct. 493 (2016), provides guidance in this case, although it is distinguishable on the facts, as explained below. In *Cairel*, law enforcement officers used standard interrogation techniques – persistent questioning and falsely promising relief if the suspect cooperated – to extract a confession from a suspect they knew had a learning disability and had been in special education classes. *Id.* at 828-29. The suspect "appeared to participate fully in the interrogation, corrected errors in the written confession as needed, and said he was treated well by the police." *Id.* at 834. The Court of Appeals upheld summary judgment for the defendants, holding that in such circumstances the suspect's learning disability did not render the interrogation techniques used shocking to the conscience. *Id.* at 833.

The Court believes Outlaw has alleged facts that plausibly suggest the interrogation conduct of Jones and Mason "shocked the conscience." First, unlike the suspect in *Cairel*, Outlaw had a near rock-bottom IQ indicating an intellectual disability rather than simply a learning disability. A learning disability is characterized by learning difficulties in specific academic skill areas. *See* American Psychiatric Association ("APA"), *Diagnostic and Statistical Manual of Mental Disorders-V* ("*DSM-V*") § II, Neurodevelopmental Disorders, Specific Learning Disorder (5th ed. 2013), http://dsm.psychiatryonline.org/doi/book/10.1176/appi.books.9780890425596 (visited Apr. 19, 2017) ("Specific learning disorder affects learning in individuals who otherwise demonstrate normal levels of intellectual functioning."). On the other hand, intellectual disability

9

is a broader disability characterized by "significant limitations both in intellectual functioning (reasoning, learning, problem solving) and in adaptive behavior, which covers a range of everyday social and practical skills." American Association on Intellectual and Developmental Disabilities, Frequently Asked Questions on Intellectual Disability, https://aaidd.org/intellectual-disability/definition/faqs-on-intellectual-disability (visited Apr. 19, 2017). There is a qualitative difference between rough interrogation of someone who has difficulty learning and someone who has significant and broad limitations in intellectual and behavioral functioning – indeed the intellectual functioning of a nine-year-old. Standard interrogation tactics used on a child could shock the conscience, and the same may be true for a profoundly intellectually disabled individual who is essentially a young child in an adult's body.

Additionally, the interrogation tactics used on Outlaw were more severe than those used on the *Cairel* suspect. There, the officers treated him well and made no false promises or threats. Here, the officers obtained Outlaw's waiver of his *Miranda* rights under circumstances where they must have known he did not understand them. They lied to him about what his friends and family said to law enforcement, preyed on Outlaw's concern for his mother and child, threatened to take actions they may not have been empowered to take, downplayed the serious consequences of the crime, and harassed him into telling the story as they wanted it told. Rather than demonstrating understanding by correcting the officers when they misstated the facts, as the suspect in *Cairel* did, Outlaw repeatedly told the "wrong" story and was corrected by the interrogators. He displayed none of the hallmarks of understanding and voluntary cooperation present in the *Cairel* case.

In sum, Outlaw's allegations plausibly suggest Jones and Mason knew of the depths of Outlaw's intellectual deficits, and that their use of standard interrogation tactics on him could be found shocking to the conscience. Therefore, Count I states a claim for relief.

2. Qualified Immunity

The question of qualified immunity, however, is different. Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017). It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The qualified immunity test has two prongs: (1) whether the facts alleged, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232; *see Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

If the plaintiff has alleged a constitutional violation, which the Court has held Outlaw has, the Court must determine whether the right was sufficiently clear at the time of the violation that a reasonable official would have understood that what he was doing violated that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Brosseau*, 543 U.S. at 199; *Wilson*, 526 U.S. at 609. The inquiry must be made focusing on the specific context of the case, not at a high level of generality. *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "[T]he clearly established law must be 'particularized' to the facts of the case. Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* at 552 (quoting *Anderson*, 483 U.S. at 639, 640; internal citations omitted). "[E]xisting precedent must have placed the statutory or constitutional question

11

beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011).

The plaintiff bears the burden of demonstrating that a constitutional right is clearly established. *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). To determine whether the right was clearly established, this Court looks to Supreme Court and Seventh Circuit Court of Appeals decisions, then, if there is no controlling precedent, to all relevant caselaw to determine if there is a clear trend suggesting recognition of the right is inevitable. *Gill*, 850 F.3d at 341. "Qualified immunity is dissolved, however, if a plaintiff points to a clearly analogous case establishing a right to be free from the specific conduct at issue or when the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Smith v. City of Chi.*, 242 F.3d 737, 742 (7th Cir. 2001).

The Seventh Circuit Court of Appeals' recent decision of *Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017), is instructive in the qualified immunity analysis. In *Gill*, law enforcement officers interviewed a shooting suspect that they knew had an intellectual disability.[3] *Id.* at 338. The suspect was confused about his rights, and the officers used interrogation techniques that included "social isolation, confrontation, theme development, and minimization" and falsely stated to him that he had been identified by an eyewitness as the shooter and that he had failed a polygraph test. *Id.* at 339. He eventually confessed to the shooting, but the criminal court suppressed the confession as involuntary, and the charges were eventually dropped. *Id.* The suspect sued the officers who questioned him, but the Court found they were entitled to qualified immunity because the law regarding coercive interrogation was not clearly established at the time of the interrogation. *Id.* at 340.

The plaintiff in *Gill* argued that the right "to be free from coercive interrogation tactics"

---

[3] It is unclear whether the Court of Appeals used the term "intellectual disability" in its technical sense or whether it was just shorthand for cognitive impairments.

was clear at the time of his interrogation based on the established principles that "individuals with a diminished mental capacity can be particularly susceptible to coercive interrogation tactics" and "interrogation tactics that 'shock the conscience' may give rise to substantive due process claims." *Id.* (citing *Smith v. Duckworth*, 910 F.2d 1492, 1497 (7th Cir. 1990); *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010)). The Court of Appeals found, however, that the plaintiff's articulation of a clearly established right was at too high a level of generality to avert qualified immunity. *Id.* at 341. The Court of Appeals observed:

> Whether interrogation tactics are unconstitutionally coercive is an inquiry that depends on the specific facts and circumstances present in a particular case. . . . The right "to be free from coercive interrogation" is highly generalized. Therefore, it cannot be the basis for defeating a qualified immunity defense, unless there is closely analogous precedent that is "particularized" to the facts of the instant case.

*Id.*

In the case at bar, Outlaw points to *Chavez v. Martinez*, 538 U.S. 760, 774 (2003), and its progeny to argue that the right at issue in Count I was clearly established at the time of Outlaw's interrogation. In *Chavez*, law enforcement interrogated a suspect who had been shot in the face. *Chavez*, 538 U.S. at 764 (Thomas, J.). The interview occurred while the suspect was in an emergency room receiving treatment for his injuries, was in tremendous pain, and believed he was on his death bed. *Id.* (Thomas, J.). While a plurality of justices believed that such coercive interrogation would be unconstitutional, *id.* at 788 (Stevens, J., concurring in part and dissenting in part); *id.* at 798 (Kennedy, J., concurring in part and dissenting in part; joined by Stevens, J., and Ginsburg, J.), the facts in *Chavez*, do not resemble the facts in this case. Outlaw has pointed to no other Supreme Court or Seventh Circuit case with facts similar to his that would establish what constitutes interrogation that shocks the conscience in his circumstances, and, indeed, *Gill* suggests such a case does not exist.

13

Outlaw points to other cases from other courts, but those cased do not suggest a clear trend showing that the recognition of the contours of Outlaw's rights in his circumstances is only a matter of time. One district court case from the Northern District of Illinois found unconstitutional interrogation where law enforcement officers withheld food, water and a toilet, the suspect was in very bad physical condition, and law enforcement officers offered medical treatment in exchange for a confession. *Scott v. City of Chi.*, No. 07 C 3684, 2010 WL 1433313, at *6 (N.D. Ill. Apr. 8, 2010). The Fifth Circuit Court of Appeals held in *Payne v. Dickerson*, 334 F. App'x 629, 631 (5th Cir. 2009), that it was impermissible coercive to withhold water from a suspect for a day after he had been locked in a hot car, to ignore his assertions of his *Miranda* rights, and to arrest or threaten to arrest family members. The final case cited by Outlaw, *Martinez v. City of Oxnard*, 337 F.3d 1091, 1092 (9th Cir. 2003), is the decision after remand in the *Chavez* case, which the Court has already noted does not resemble the facts or circumstances of this case. No case cited by Outlaw is clearly analogous to this case such that it clearly established for Jones and Mason that their interrogation of Outlaw violated his Fourteenth Amendment substantive due process rights.

For this reason, while Count I states a claim for relief, Jones and Mason are entitled to qualified immunity and dismissal of Count I.

B.  Count II: Self-Incrimination

Count II is a claim under 42 U.S.C. §1983 for violation of Outlaw's Fifth Amendment right against self-incrimination because his false confession was coerced and then used to initiate a criminal prosecution against him.

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Self-Incrimination Clause applies

14

to state and local governments through the Fourteenth Amendment Due Process Clause. *Malloy v. Hogan*, 378 U.S. 1, 10-11 (1964).

The parties appear to agree on the fundamental principles of the law regarding the right against self-incrimination. They agree that the law requires law enforcement officers to inform a suspect of his right to remain silent and his right to an attorney – "*Miranda* rights," named after *Miranda v. Arizona*, 384 U.S. 436 (1966) – before conducting a custodial interrogation and that a suspect may voluntarily waive those rights and talk to law enforcement officers without an attorney present to represent him. They also agree that a statement given in custodial interrogation without a voluntary waiver of the *Miranda* rights generally cannot be used in a criminal proceeding against the suspect. And finally, they agree that Outlaw's statements made during his custodial interrogation were used against him in a criminal proceeding when they were used to indict him. They dispute, however, whether he voluntarily waived his right against self-incrimination during the interrogation when he signed the written waiver form and proceeded with the interview.

In *Moran v. Burbine*, 475 U.S. 412 (1986), the Supreme Court set out a two-part test to determine the voluntariness, and therefore the validity, of a waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* at 421. Accordingly, in determining if a waiver was voluntary, courts should consider factors such as the "defendant's background and conduct, the duration and conditions of detention, the mental and physical condition of the defendant, the attitude of the police, and whether the police

15

utilized psychological or physical coercion." *United States v. Jackson*, 300 F.3d 740, 748 (7th Cir. 2002) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). It is clear that coercion by law enforcement officers in obtaining a waiver will invalidate the waiver. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986); *Moran*, 475 U.S. at 422.

The allegations in Outlaw's Second Amended Complaint plausibly suggest that his waiver and subsequent statements to Jones and Mason were not voluntary considering the relevant factors. Those statements were used to indict Outlaw. Those allegations plausibly suggest Outlaw is entitled to relief on Count II, so the Court will not dismiss Count II for failure to state a claim.

B.  Count V: § 1983 Conspiracy

In Count V, Outlaw alleges two conspiracies, one of which involved the Jones, Mason and unnamed others conspiring to coerce a confession from Outlaw. In order to state a claim for conspiracy under § 1983, a plaintiff must plead facts plausibly suggesting individuals reached an understanding to deprive the plaintiff of his constitutional rights. *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007).[4] If there is no underlying constitutional violation, there can be no viable conspiracy claim. *Katz-Crank v. Haskett*, 843 F.3d 641, 650 (7th Cir. 2016), *pet. for cert. filed*, No. 16-8240 (Mar. 6, 2017).

The sole argument Jones and Mason make is that the Court should dismiss Count V against them because there is no underlying constitutional violation. They make this argument in

---

[4] Usually, a § 1983 conspiracy claim is alleged against private actors who conspire with state actors, not simply against state actors who are already subject to § 1983 liability. Private actors are not ordinarily subject to § 1983 liability because they are ordinarily not acting under color of state law but may be if they willfully participate in joint activity with state actors. *See Reynolds*, 488 F.3d at 764; *Cooney v. Rossiter*, 583 F.3d 967, 970 (7th Cir. 2009). "[C]laims for alleged conspiracies between state actors are possible under section 1983, though as we have observed, they add nothing but needless complexity." *Ewell v. Toney*, No. 16-1009, 2017 WL 1315666, at *3 (7th Cir. Apr. 10, 2017).

16

anticipation that the Court will dismiss the substantive due process claim in Count I and the self-incrimination violation claim in Count II. However, the Court has not dismissed Count II, so there remains a potential underlying constitutional violation to support Count V. For this reason, the Court declines to dismiss Count V against Jones and Mason.

        C.        <u>Count VI: Intentional Infliction of Emotional Distress</u>

In Count VI, Outlaw claims the acts of Jones and Mason during the interrogation were extreme and outrageous and were undertaken intentionally or recklessly to cause Outlaw severe emotional distress. A claim for intentional infliction of emotional distress has three elements: (1) the conduct involved was "truly extreme and outrageous," (2) the defendant either intended to inflict, or knew there was a high probability he would cause, severe emotional distress, and (3) the defendant actually caused severe emotional distress. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (citing *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). To support an intentional infliction of emotional distress claim, the conduct must be "so severe that no reasonable man could be expected to endure it." *Feltmeier*, 798 N.E.2d at 84 (citing Restatement (2d) of Torts § 46, comment j, at 77-78 (1965)). In the decision whether conduct is extreme or outrageous, important factors include whether the defendant abused "some position which [gave] him actual or apparent authority over the plaintiff or the power to affect the plaintiff's interests," whether the defendant knew the plaintiff was "particularly susceptible to emotional distress, because of some physical or mental condition or peculiarity," and whether the officer reasonably believed his objective prompting his conduct was legitimate. *Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201, 211 (Ill. 1992); *Cairel v. Alderden*, 821 F.3d 823, 835-36 (7th Cir.), *cert. denied*, 137 S. Ct. 493 (2016). "Behavior that might otherwise be considered merely rude, abrasive or inconsiderate, may be deemed outrageous if the defendant knows that the plaintiff is particularly susceptible to

emotional distress." *Kolegas*, 607 N.E.2d at 211.

In *Fox v. Hayes*, 600 F.3d 819 (2010), the Court of Appeals examined a police officer's statements to the wife of a suspect accused of killing their daughter. *Id.* at 842. The profanity-laced statement expressed that the husband was a liar and a murderer, that he never loved the wife or his daughter, that he killed the daughter, and that the wife just needed to get over it. *Id.* The Seventh Circuit Court of Appeals held that such allegations sufficiently pled extreme and outrageous conduct in light of the fact that the officer was in charge of the husband's investigation, basically held the family life of the wife in the balance, and intentionally used that power to cause her distress. *Id.* The Court also considered the particular vulnerability of the wife because she had just had her child murdered and her husband had been accused of the crime. *Id.*

The Court believes Outlaw has sufficiently pled extreme and outrageous conduct due to the harsh interrogation techniques used by Jones and Mason. While the Court thinks in the run-of-the-mill interrogation case – even of a learning disabled suspect like in *Cairel* – those tactics would easily fall short of extreme or outrageous, when the interrogation is of a suspect they know is intellectually disabled, it could cross the line. One of the characteristics of an intellectually disabled person are difficulty with reasoning, problem solving, judgment, practical understanding, and self-management. *See* APA, *DSM-V* § II, Neurodevelopmental Disorders, Intellectual Disability (5th ed. 2013), http://dsm.psychiatryonline.org/doi/book/10.1176/appi.books.9780890425596 (visited Apr. 19, 2017). It is not a great leap to say that individuals with deficits in those areas are more likely to be stressed or traumatized under harsh law enforcement interrogation than the ordinary adult. *See id.* (regarding mildly intellectually disabled individuals, "There may be difficulties regulating emotion and behavior in age-appropriate fashion."); *Smith v. Duckworth*, 910 F.2d 1492, 1497 (7th Cir. 1990) (recognizing

that it takes less to induce fear in a suspect whose capacity for rational choice is limited). Furthermore, the intent of the defendants was to cause distress in order to coerce Outlaw into confessing to the robbery. While the ultimate goal of finding the perpetrator of the crime would certainly be a legitimate objective, extracting a false confession is not, and the allegations in the Second Amended Complaint suggest the latter was Jones and Mason's actual goal.

For these reasons, like the court in *Fox*, this Court finds Outlaw's allegations regarding his interrogation are sufficient to boost an otherwise ordinary set of facts into an intentional infliction of emotional distress claim. Accordingly, the Court declines to dismiss Count VI.

D. Count VII: State Law Civil Conspiracy

In Count VII, Outlaw alleges that the defendants conspired to accomplish an unlawful purpose by an unlawful means, including intentionally inflicting him with emotional distress. A state law claim for conspiracy has three elements: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004) (citing *Adcock v. Brakegate, Ltd.,* 645 N.E.2d 888, 894 (Ill. 1994)).

The sole argument Jones and Mason make is that the Court should dismiss Count VII against them because there are insufficient facts to state a cause of action for intentional infliction of emotional distress. They make this argument in anticipation that the Court will dismiss Count VI. However, the Court has not dismissed that count, so there remains a potential conspiracy claim in Count VII. For this reason, the Court declines to dismiss Count VII against Jones and Mason.

E. Counts VIII and IX: *Respondeat Superior* and Indemnification

In Count VIII, Outlaw seeks to hold the Village of Cahokia liable for the state law torts committed by its employees Jones and Mason, and in Count IX, he seeks to force the Village of Cahokia to pay any judgment against Jones or Mason. The Cahokia defendants ask the Court to dismiss these claims because they anticipate the Court will dismiss all other claims against Jones and Mason. Because the Court has not done so, these claims should remain in the case.

## IV. Conclusion

For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** the motion to dismiss filed by the Cahokia defendants (Doc. 91);

- **DISMISSES with prejudice** Count I against Jones and Mason; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**DATED: April 26, 2017**

                                            s/ J. Phil Gilbert
                                            **J. PHIL GILBERT**
                                            **DISTRICT JUDGE**